## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| CHILD EVANGELISM FELLOWSHIP OF MINNESOTA, | Civil No. 10-2687 (JRT/JJK) |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION AND ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION** |
| MINNEAPOLIS SPECIAL SCHOOL DISTRCT No. 1, | |
| Defendant. | |

G. Craig Howse, **HOWSE & THOMPSON, PA**, 3189 Fernbrook Lane North, Plymouth, MN 55447; Stephen M. Crampton, **LIBERTY COUNSEL**, 100 Mountain View Drive, #2150, Lynchburg, VA 24502, for plaintiff.

Michael J. Vanselow and Marie L. van Uitert, **OPPENHEIMER WOLFF & DONNELLY LLP**, Plaza VII Building, Suite 3300, 45 South 7th Street, Minneapolis, MN 55402, for defendant.

Child Evangelism Fellowship of Minnesota ("CEF") brought this action against Minneapolis Special School District No. 1 ("the District") seeking preliminary injunctive relief preventing the District from violating CEF's freedom of speech, free exercise of religion, and other constitutional rights.  CEF alleges that the District abruptly revoked CEF's right to participate in an after school program upon a complaint that CEF was engaging in religious activity with students.  Because the Court finds it unlikely that CEF

will prevail on the merits of its claim and that no irreparable harm will accrue to CEF if preliminary injunctive relief is denied, the Court denies CEF's motion for a preliminary injunction.

## BACKGROUND

### I.   CHILD EVANGELISM FELLOWSHIP

The Child Evangelism Fellowship of Minnesota is the local chapter of an international non-profit Christian organization headquartered in Missouri.  Among the ministries sponsored by CEF is the Good News Club ("GNC"), an after-school program open to children ages five through twelve.  (Decl. of David Tunell ¶¶ 1-2, Oct. 31, 2010, Docket No. 12.)  CEF describes its activities as encouraging learning, spiritual growth, service to others, and providing activities that support the development of social, mental, physical, and creative abilities of school-age children as structured youth programs.  (*Id.* ¶ 2.)  CEF conducts GNC meetings after school, generally on public elementary campuses, because it finds them convenient and safe for students and parents.  (*Id.* ¶ 5.) GNC meetings include Bible lessons, creative learning activities, stories about missionaries and biblical figures modeling spiritual and personal leadership, songs, and scripture memorization.  Additionally, at GNC meetings children are "introduced to Jesus Christ as their savior."  (Decl. of Stephen M. Crampton, Jan. 3, 2011, Exs. M-N, Docket No. 11.)  At oral argument, counsel for CEF acknowledged that prayer occurs at GNC meetings.  No fees are charged for attending GNC meetings, and no tithes or contributions are taken during meetings.

GNC meetings are open to all children regardless of religion, so long as they obtain written permission from their parents.  CEF produces flyers to promote GNC meetings, which say: "At clubs, children are introduced to Jesus Christ as Savior and taught Biblical principles for living."  (Aff. of Sandra McDonald, Jan. 21, 2011, Ex. C, Docket No. 17.)  Another flyer states, "CEF is an interdenominational missionary organization that seeks to evangelize boys and girls with the Gospel of the Lord Jesus Christ and to disciple them in the Word of God . . . ."  (Aff. of Linnea Hacket, Jan. 21, 2011, Ex. B, Docket No. 21.)

GNCs do not provide after-school transportation.  Thus, the central location of an elementary school, and use of the after school activities bus to bring students home allows parents to register their children in the GNC as they would for other organizations' programs.  (Tunell Decl. ¶¶ 5-6.)

## II.  MINNEAPOLIS SPECIAL SCHOOL DISTRICT NO. 1 AND THE COMMUNITY PARTNER ONLINE PROCESS

The District implemented the Community Partner Online ("CPO") process in the 2005-06 school year in order to formalize the way in which the District screens individuals or organizations that interact with students or are on District property when students are present.  (Aff. of Robyn Cousin ¶ 2, Jan. 24, 2011, Docket No. 18.)  The District's policies provide that "any non-school, non-district sponsored group or individual may apply to become a Community Partner ("CP") with the Minneapolis Public Schools" through the CPO process.  (District Policy 1301, Cousin Aff. Ex. B.)  In order for individuals or organizations to become certified as a Community Partner, they

must complete the application, review and execute a "Standard Assurances" signature page, submit proof of insurance, and, in some circumstances, provide Articles of Incorporation or proof of appropriate licensure.  (Cousin Aff. Exs. C, E.)

District Policies 1301 and 1301A describe the selection that occurs in the CPO process to determine which Standard Assurances the individual or organization is required to sign and any additional requirements that must be met in the application process to obtain certification.  To complete the CPO process, potential CPs must also execute a written contract relating to their participation with the District which also needs to be signed by a school principal or Site Coordinator.  (*Id.* Exs. D-E.)  Once the CPO application is complete, the District provides potential CPs with a  Discussion guide (*Id.* Ex. F) to help the District and the proposed CP determine if and how they will work together to reach an agreement on a CPO contract.

The partnership eventually agreed upon may include various types of arrangements, including use of the District's facilities, the opportunity for the CP to distribute flyers through the District's flyer distribution process, the CP's work at the school during school hours, or participation by the CP in the District's After-School Program.  (*Id.* ¶¶ 8, 10-12.)  The District distributes CPs' flyers to students to take home to their parents for review.  All flyers distributed through the District flyer distribution process must include the following disclaimer: "The Minneapolis Public Schools is legally unable to and cannot sponsor, endorse or recommend the activities announced by this flyer."  (Aff. of Colleen Sanders, Jan. 25, 2011, Ex. H, Docket No. 19.)  Meetings

and recreational spaces are free of charge to not-for-profit groups that provide programs and services to children and other community members.  (*Id.* ¶ 6.)  Once the CP and the District reach an understanding of the relationship and their respective roles, the CP and the school principal or site administrator for the District sign a contract, completing the CPO process.

## III. DISTRICT SPONSORED AFTER-SCHOOL YOUTH ENRICHMENT PROGRAM

The After-School Youth Enrichment Program ("After-School Program") allows a public school board to "initiate a community education program in [their] district[s] and provide for the general supervision of the program."  Minn. Stat. § 124D.19, subd. 1. "Each board may, as it considers appropriate, employ community education staff to further the purposes of the community education program."  *Id.*  Pursuant to this statute, the District created a Community Education Department ("CED") to provide opportunities for local citizens, schools, agencies, and institutions to become active partners in addressing education and community concerns.  (Aff. of Jack Tamble ¶ 2, Jan. 25, 2011, Docket No. 20.)

The statute further provides:

**Subd. 12.   Youth after-school enrichment programs.**  Each district operating a community education program under this section may establish a youth after-school enrichment program to maintain and expand participation by school-age youth in supervised activities during nonschool hours.  The . . . programs must include activities that support development of social, mental, physical, and creative abilities of school-age youth; provide structured youth programs during high-risk times; and design programming to promote youth leadership development and improved academic performance.

**Subd. 13. Youth after-school enrichment program goals.** The goals of youth after-school enrichment programs are to:

(1) collaborate with and leverage existing community resources that have demonstrated effectiveness;

(2) reach out to children and youth, including at-risk youth, in the community;

(3) increase the number of children participating in adult-supervised programs during nonschool hours;

(4) support academic achievement; and

(5) increase skills in technology, the arts, sports, and other activities.

Minn. Stat. § 124D.19.

Pursuant to this statute, the District sponsors an After-School Program at several schools, including at Jenny Lind Elementary ("Jenny Lind"). The After-School Program at Jenny Lind is sponsored by the District, which hires, monitors, and manages the Site Coordinators who are selected and paid by the District to implement the District's programming. (Tamble Aff. ¶ 6.) The Site Coordinators report to managers and other supervisors within the CED, and each site with an After-School Program also has a Site Coordinator who is an employee of the CED. (*Id.* ¶ 7.) The Site Coordinator is responsible for setting the classes offered through the District's After-School Program and meeting with organizations and individuals in the community who have expressed interest in participating in the Program. (Hackett Aff. ¶ 2, Docket No. 21.)

The District's Site Coordinators are also responsible for managing and monitoring After-School Program's activities by: (1) assisting with obtaining supplies as needed; (2) collecting and organizing student registrations for the After-School Program through the "class choices" form that the Site Coordinators and other District staff create and

distribute; (3) ensuring that teachers of each class receive a list of students attending; (4) taking attendance for each of the class meetings; (5) arranging busing and snacks at the District's expense for students participating in the classes; and (6) assisting teachers of classes with any behavior management issues that arise during the program. (Hackett Aff. ¶ 4; Tamble Aff. ¶¶ 8-9; McDonald Aff. ¶ 4.) In addition, before the After-School Program classes begin, the Site Coordinators must orient the groups and individuals to the expectations of the students and District and, in some instances, help reshape the messages of the class in order to better meet the needs of the students. (Hacket Aff. ¶ 3.)

The After-School Program organizations are largely a subset of the CPs which complete the CPO process. There are many more CPs than there are organizations in the After-School Program. Thus, each Site Coordinator is responsible for deciding which group or individual CP may participate in the District's After-School Program. (Cousin Aff. ¶ 11; Hackett Aff. ¶ 2.) The Site Coordinator has the ability to determine that a proposed class is not appropriate for District sponsorship, in which case the program can be part of the CPO process and use District facilities, but it cannot be part of the After-School Program. (*Id.*)

Some religiously affiliated groups have been included as part of the After-School Program, such as the Boy Scouts and the YWCA. (Sanders Aff. ¶ 4 & Ex. A.) However, "[a]ccording to the information provided by the groups and the District's monitoring and supervision of these programs, none of the groups that participated in the After-School Program during the 2009-10 school year participated in proselytizing or praying with students." (*Id.* ¶ 4.)

## IV.    GNC AT JENNY LIND ELEMENTARY

In approximately 2000, CEF approached the site coordinator at Jenny Lind and asked to be permitted to hold its meetings at the school.  (Hackett Aff. ¶ 6.)  CEF provided Linnea Hacket, then the Community Education Coordinator for the District at Jenny Lind, with a copy of a legal judgment and told her that the judgment stated the GNC was entitled to hold its meetings at the school.  (*Id.* ¶¶ 1, 6.)  Hackett spoke with her supervisors who agreed that the District would permit CEF to hold GNC meetings at Jenny Lind.   However, CEF did not ask for the GNC to be part of the After-School Program at that time, it only asked to use the space with its own permits.  (*Id.*)  Hackett testified that although the GNC used the District facilities and was allowed to pass out flyers starting in approximately 2000, she did not believe that CEF had a contract with the District prior to the implementation of the CPO process in the 2005-06 school year.  CEF printed its own flyers regarding GNC meetings that were distributed by the District as part of the flyer-distribution process for community groups.

The District alleges that CEF ultimately became part of the After-School Program through confusion among District staff regarding the issue of whether CEF and other religiously affiliated groups were permitted to participate.  (Tamble Aff. ¶ 16.)  Hackett testified that during the 2004-05 school year she encountered difficulties when students in the GNC were not being picked up after meetings, so she decided to send some students home on the "after-school activities" bus since it was going near their homes, and the practice continued for several years.  (Hackett Aff. ¶ 12.)  Hackett also testified that

sometime in the 2005-06 school year she began including the GNC on the District's After-School Program "class choices" form "out of convenience because their meetings lasted all year and this way the students didn't have to re-register for the [GNC] meeting over the course of the year." (*Id.* ¶ 11.)  Since 2005-06 when the District's CPO process began, CEF has been certified as a CP, and has applied for, and been granted, recertification every year. (Cousin Aff. ¶ 14.)

During the 2008-09 school year, Jenny Lind was assigned a new Site Coordinator, Sandra McDonald, to administer the After-School Program.  In the spring of 2009, the Director of the CED, Jack Tamble, made a site visit to Jenny Lind as part of his normal practice of monitoring the Community Education programs. (Tamble Aff. ¶ 14.)  During the visit, McDonald met with Tamble and expressed concern regarding whether the GNCs were appropriate for the District's After-School Program given the meetings' description contained on the District's flyer, and the proselytizing and prayer at the meetings. (*Id.* ¶ 15; McDonald Aff. ¶ 7 ("I became concerned that CEF's Good News Club meetings may not be appropriate for the [After-School Program] after . . . overhearing praying . . . .").)

In the fall of 2009, Maureen Berger, CEF ministry leader for the Twin Cities area, was notified by McDonald that CEF had been removed from the list of CPs in the After-School Program, which meant that the District would no longer be able to make available the after-school activities bus or treats, or include the GNC on the "class choices" registration form.  McDonald also told CEF that it could apply for a permit to use the District's facilities and distribute its own flyer through the District's flyer distribution

process.  CEF completed a CPO renewal application for the 2009-10 and 2010-11 school years, both of which were granted.  (Crampton Decl. Ex. J.)  During the 2009-2011 schools years, CEF applied for and obtained permits to use space at Jenny Lind, and applied for and was able to distribute its own flyers to students as part of the District's flyer distribution process, outside of the After-School Program "class choices" form.

In 2010, CEF's State Director David Tunell exchanged letters with the District about why CEF had been removed from the After-School Program.  Assistant District General Counsel Amy Moore wrote to CEF stating that "CEF programming was not appropriate" because "CEF Programming included leading the children in prayer, teaching them that Jesus Christ is their savior, and studying Biblical passages." (Crampton Dec. Ex. I.)  Moore also stated that the After-School Program is "wholly funded coordinated, reviewed and monitored by the District.  The District is not able to separate from or remove its sponsorship of the After-School Program, and must remain neutral towards religion." (*Id.*)

Thirty-one students attended GNC meetings during the 2004-05 school year, 26 students attended in 2005-06, 36 students in 2006-07, 47 students in 2007-08 and 2008-09, and 10 students in 2009-10.  CEF alleges that this decline in attendance constitutes a form of irreparable harm.  CEF also alleges it has suffered financial harm by not being listed with other after-school programs because it had to pay for and print separate invitation flyers to be distributed to students, and provide snacks.  (Berger Decl. ¶ 14.)

CEF brought this motion for a preliminary injunction seeking to enjoin the District from denying CEF access to the additional benefits afforded to participants in the After-

School Program, such as busing and treats, that are not currently provided to them as CPs.

## ANALYSIS

## I.    STANDARD OF REVIEW

In determining whether a party is entitled to preliminary injunctive relief, the Court considers "(1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that [the] movant will succeed on the merits; and (4) the public interest." *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981). "[T]he question is whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." *Id.* "It frequently is observed that a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong,* 520 U.S. 968, 972 (1997) (emphasis omitted) (internal quotation marks omitted). "In First Amendment cases, courts first determine the likelihood of success on the merits because if it is shown with likelihood that a deprivation of First Amendment freedoms occurred, such a showing is often determinative under the *Dataphase* analysis." *Child Evangelism Fellowship of Minnesota v. Elk River Area Sch. Dist. #728*, 599 F. Supp. 2d 1136, 1139 (D. Minn. 2009).

## II.       PROBABILITY OF SUCCESS ON THE MERITS

In evaluating the "probability of success on the merits," the Court need not discern with mathematical precision whether the plaintiff has a greater than fifty percent chance of prevailing.  *Dataphase*, 640 F.2d at 113.

> The equitable nature of the proceeding mandates that the court's approach be flexible enough to encompass the particular circumstances of each case. Thus, an effort to apply the probability language to all cases with mathematical precision is misplaced. . . .  [W]here the movant has raised a substantial question [as to irreparable harm] and the equities are otherwise strongly in his favor, the showing of success on the merits can be less. . . . [W]here the balance of other factors tips decidedly toward plaintiff a preliminary injunction may issue if movant has raised questions so serious and difficult as to call for more deliberate investigation.

*Id.* (footnotes omitted).

CEF argues that being denied access to the After-School Program has infringed its free speech rights, among others, because it does not enjoy the same benefits, such as treats and busing, provided to other participants in the After-School Program.   The District first argues that speech has not been infringed since CEF has access to its facilities and is presently using them.  The District also argues that even if it is infringing CEF's speech, it is permissible as a compelling government interest in avoiding a violation of the Establishment Clause.

### A.       Free Speech

Analyzing a potential violation of a First Amendment free speech right requires the Court first to determine what type of forum is at issue – whether it is a traditional "open" public forum, or a more limited forum – and then to determine if the restrictions

or regulations applied to the speech in that forum are constitutionally permissible. *See Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 266-67 (1988); *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 806 (1985). CEF alleges that the District created a public forum through the creation of the After-School Program, and is engaging in viewpoint discrimination by preventing CEF from participating in the After-School Program.

### 1.    Type of Forum

CEF argues that the District has opened a designated or limited public forum because there is no limit on the groups allowed to use the District's facilities or the subjects those groups may address.[1] The nature of permissible limitations on speech is based on the nature of the forum in which the speech is delivered. *See Does v. S. Iron R-1 Sch. Dist.*, 498 F.3d 878, 882 (8th Cir. 2007); *see also Bronx Household of Faith v. Cmty. Sch. Dist. No. 10*, 127 F.3d 207, 211 (2d Cir. 1997). There are three general types of forums: (1) traditional public forums, (2) designated public forums, and (3) non-public forums. *See Cornelius*, 473 U.S. at 802. "The public schools do not possess all of the attributes of streets, parks, and other traditional public forums that 'time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.'" *Hazelwood*, 484 U.S. 267 (quoting *Hague v. CIO*, 307 U.S.

---

[1] CEF makes no distinction between the After-School Program as a forum, and the CPO process as a forum. Because CEF does not distinguish between the After-School Program and Community Partners who have merely completed the CPO process, the Court assumes that whenever CEF is discussing exclusion or denial of benefits from a program, they mean the After-School Program, which is the only forum to which they do not presently have access.

496, 515 (1939)). Thus, school facilities may be deemed to be public forums only if school authorities have "by policy or by practice" opened those facilities "for **indiscriminate** use by the general public," *Perry Educ. Ass'n  v. Perry Local Educators' Ass'n*, 460 U.S. 37, 47 (1983) (emphasis added), or by some segment of the public, such as student organizations.  *Id.* at 46 n.7.  "If the facilities have instead been reserved for other intended purposes, 'communicative or otherwise,' then no public forum has been created, and school officials may impose reasonable restrictions on the speech of students, teachers, and other members of the school community." *Kuhlmeier*, 484 U.S. at 267.

"A designated public forum is a nonpublic forum the government intentionally opens to expressive activity for a limited purpose such as use by certain groups or use for discussion of certain subjects." *Bowman v. White*, 444 F.3d 967, 975 (8th Cir. 2006) (citing *Perry*, 460 U.S. at 46).  "A limited public forum is a subset of the designated public forum that arises where the government opens a non-public forum but limits the expressive activity to certain kinds of speakers or to the discussion of certain subjects." *Id.* at 976 (internal quotation marks and alterations omitted).  The classification of a forum as a limited designated public forum "is significant because it controls the level of scrutiny given to restrictions on speech . . . [I]n a limited designated public forum, '[r]estrictions on speech not within the type of expression allowed in a limited public forum must only be reasonable and viewpoint neutral.'" *Id.* (quoting *Make the Road By Walking, Inc. v. Turner*, 378 F.3d 133, 143 (2d Cir. 2004)).  In a limited designated public forum, **content discrimination** "may be permissible if it preserves the purposes of

that limited forum"; but viewpoint discrimination "is presumed impermissible when directed against speech otherwise within the forum's limitations." *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 830 (1995). "The principle [of viewpoint discrimination]. . . 'is that the First Amendment forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others.'" *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist*, 508 U.S. 384, 394 (1993) (quoting *City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 804 (1984)).

Because a school must take some action to make itself a public forum, the Court evaluates whether the District opened the forum to expressive activity for indiscriminate use, or for a limited purpose, such as use by certain groups or use for discussion of certain subjects. *Bowman*, 444 F.3d at 975; *see also Perry*, 460 U.S. at 47. The factual record makes clear that the District has not opened the After-School Program for indiscriminate use by the general public, and that the After-School Program limits which groups are entitled to be included on its "class activities" calendars, and utilize its buses and snacks. (*Compare* Sanders Aff. Ex. B *with* Crampton Decl. Ex. J.) The question then becomes whether the way in which the District limits access to the After-School Program itself makes the After-School program a limited or designated public forum, or a non-public forum.

Here, the District has clearly opened the "forum" of the After-School program to expressive activity, and it has limited the purposes and programs for which the After-School Program can be used. As such, the District may engage in content discrimination to preserve the purposes of the After-School Program, but the District's restrictions on

speech must be reasonable and viewpoint neutral.  *Bowman*, 444 F.3d at 975.  Thus the Court must address whether the District has improperly limited access to the limited designated public forum of the After-School Program through viewpoint discrimination that is not reasonably related to the purpose for which the forum has been opened.

## 2.      Viewpoint Discrimination

"The State's power to restrict speech . . . is not without limits.  The restriction must not discriminate against speech on the basis of viewpoint, and the restriction must be 'reasonable in light of the purposes served by the forum.'"  *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106-07 (2001) (citing *Rosenberger*, 515 U.S. at 829) (citation omitted); *see also Cornelius*, 473 U.S. at 806.  CEF complains that it should be allowed the same right of access to the facilities **and opportunities** offered to other community groups under the umbrella of the After-School Program, under the same terms and conditions as secular programs.  CEF seeks access to the school activities bus, treats, and inclusion on the After-School Program "class activities list," not just the CPO flyer on which it is presently included.  CEF contends that being denied access to these additional benefits, provided only to programs in the After-School Program, is viewpoint discrimination, as other groups get access to the treats and busing, whereas CEF does not because of its religious viewpoint.

CEF relies heavily on *Milford*, in which the Supreme Court found that a school district excluded a GNC on the basis of the religious nature of its viewpoint.  *See Milford,* 533 U.S. at 112.  The Milford Central School ("Milford") adopted a policy that district

residents could use the school for "instruction in any branch of education, learning or the arts" and for "social, civic and recreational meetings and entertainment events, and other uses pertaining to the welfare of the community, provided that such uses shall be nonexclusive and shall be opened to the general public." *Id.* at 102 (internal quotation marks omitted). The sponsors of the local GNC asked Milford if it could hold weekly after-school meetings in the school cafeteria. *Id.* at 103. Milford denied the request because its policy prohibited use by individuals or organizations for a religious purpose. *Id.* The district also asked for clarification of the GNC's activities and, after reviewing submissions from the GNC's attorneys, concluded that the GNC's activities were not "a discussion of secular subjects such as child rearing, development of character and development of morals from a religious perspective, but were in fact the equivalent of religious instruction itself." *Id.* at 104 (internal quotation marks omitted).

The Supreme Court determined that Milford had created a limited public forum, and it could be justified in reserving its forum for certain groups or for the discussion of certain topics, but could not discriminate against speech on the basis of viewpoint. *Id.* at 106-07. The Court found that Milford excluded the GNC on the basis of the religious nature of its viewpoint and did not reach the issue of whether the policy was unreasonable in light of the purposes served by the forum. *Id.* at 107. It found that something that is "quintessentially religious" or "decidedly religious in nature" can also teach morals and character development from a particular viewpoint. *Id.* at 111 (internal quotation marks omitted). It concluded that under the Free Speech Clause there is "no logical difference in kind between the invocation of Christianity by the Club and the

invocation of teamwork, loyalty, or patriotism by other associations to provide a foundation for their lessons." *Id.* Thus, the Court determined that teaching morals and character development from a religious viewpoint cannot be restricted.

CEF also points to *Elk River*, 599 F. Supp. 2d at 1141, in which the court issued a preliminary injunction enjoining implementation of a policy allowing only organizations identified as "patriotic organizations" under 20 U.S.C. § 7905(b)(1) to distribute literature and attend school district open houses, when the GNC was not listed as a "patriotic organization." However, the court found "even though [Elk River] has not discriminated on the basis of viewpoint, Congress has done so by classifying certain organizations as patriotic. This classification endorses a certain patriotic viewpoint while leaving other viewpoints, that may be equally patriotic, off the list." *Id.* at 1141. In a similar case involving allegedly disparate treatment of GNCs as compared to Boy Scout troops, the Eighth Circuit found that CEF demonstrated it had a religious viewpoint regarding moral character and youth development, and that it was impermissible for a school district to discriminate based on the particular perspective by which the Club approaches topics such as moral character and development. *Good News/Good Sports Club v. Sch. Dist. of the City of Ladue*, 28 F.3d 1501, 1507 (8th Cir. 1994) The court stated that the "only difference [between the Boy Scouts and the Good News Club] is that the [Good News] Club employs a religious perspective." *Id.* at 1506 n.7.

These three cases, however, are distinguishable. First, in *Milford*, the Supreme Court found that the Club's meetings were **not** sponsored by the school, as opposed to this case where the District sponsors the After-School Program. *Milford*, 533 U.S. at

113.   In addition, the remedy sought in *Milford* was access to Milford's facilities, which CEF has already been granted by the District through the CPO process. *See Milford*, 533 U.S. at 108-09.

In *Ladue*, the Eighth Circuit found it constitutionally impermissible that Ladue excluded **all** groups from district facilities between 3:00 and 6:00 p.m., except the Boy Scouts and athletic groups. *See Ladue*, 28 F.3d at 1510.  Such is not the case here, where CEF has expressly been granted permission to use the District's facilities.  A similar factual predicate distinguishes *Elk River*, in which the GNC was excluded entirely from facilities to which the Boy Scouts had access. *See Elk River*, 599 F. Supp. 2d at 1141.

The GNCs in *Ladue* and *Elk River* were not seeking to become part of a district-sponsored program, they were only seeking to use district space during the same time period that the Boy Scouts and athletic groups had access to the space.  In this case, the District has not placed timing restrictions on when or where the GNC can meet.  CEF has not cited, nor is the Court aware, of any case in which a court concluded that an organization enjoying equal access to a school district's facilities suffered a First Amendment violation because it was deprived of ancillary benefits such as those at issue here: treats, after-school buses, and inclusion in a class activities list.  CEF already has the ability to meet and hand out literature through the CPO Process.

Another relevant distinction between this case and *Milford* is that in *Milford*, the Supreme Court found in the record of the case no logical difference between the program and activities offered by CEF and those offered by the Boy Scouts.  The exhibits accompanying the affidavits in this case, by contrast, unequivocally demonstrate the

difference between the programs and activities of Boy Scouts and those of CEF.  For instance:

- CEF is an interdenominational missionary organization **that seeks to evangelize boys and girls** with the Gospel of the Lord Jesus Christ and to disciple them in the Word of God . . . . (Hacket Aff. Exs. A-B) (emphasis added).

- At clubs, children are introduced to Jesus Christ as Savior . . . . (Hacket Aff. Ex. C.)

- **Program Purpose/Goals:**   Introducing children to Jesus Christ as Savior . . . .  (Crampton Decl. Ex. M.)

- **Program Goals:**  Introducing children to Jesus Christ as Savior . . . . (Crampton Decl. Ex. N.)

- Boys & Girls grades K-6 **are invited to bring a friend** for fun, games, a snack and a bible lesson.  (Hacket Aff. Ex. C) (emphasis added).

These descriptions suggest that while GNCs do likely teach morals and character development from a religious perspective, which the weight of authority confirms is permissible, GNC activities include prayer and an explicit goal and purpose is to convert children to Christianity, which could run afoul of the Establishment Clause and can be restricted on the basis of content.  Analyzing the plain language "to evangelize boys and girls" demonstrates the characteristics that distinguish the activities of the Boy Scouts from those of CEF.  "Evangelize" means: "to preach the gospel to [or] to convert to Christianity . . . ."  Merriam Webster's Collegiate Dictionary 400 (10th Ed. 2001).  Courts that have analyzed GNC activities have focused on descriptions of programs that included mere religious **perspective** on otherwise acceptable topics such as leadership and patriotism.  What seems clear from CEF's own materials in this case is that speech

which cannot be government-sponsored (i.e. prayer,  proselytization) is being coupled with permissible speech (moral and character development from a religious perspective). (*See* McDonald Aff. ¶ 7) ("I became concerned . . . after . . . overhearing prayer . . . during a [GNC] meeting . . . ."); *see also Cornelius*, 473 U.S. at 806 ("[T]he government violates the First Amendment when it denies access to a speaker solely to suppress the point of view he espouses **on an otherwise includible subject**." (emphasis added)).  CEF has cited no cases in which a court found proselytizing and prayer proper content for school-sponsored speech.    Here, the District has at most engaged in **content** discrimination, in keeping religious prayer and proselytizing from the limited designated public forum of the After-School Program, while at the same time providing after-school facilities to CEF as a community partner.

Proselytization in schools has received attention by the Supreme Court, notably in a concurrence in *Milford* by Justice Stevens in which he explained:

> Distinguishing speech from a religious viewpoint, on the one hand, from religious proselytizing, on the other, is comparable to distinguishing meetings to discuss political issues from meetings whose principal purpose is to recruit new members to join a political organization. If a school decides to authorize afterschool discussions of current events in its classrooms, it may not exclude people from expressing their views simply because it dislikes their particular political opinions. But must it therefore allow organized political groups - for example, the Democratic Party, the Libertarian Party, or the Ku Klux Klan - to hold meetings, the principal purpose of which is not to discuss the current-events topic from their own unique point of view but rather to recruit others to join their respective groups? I think not.

> \*      \*      \*

> School officials may reasonably believe that evangelical meetings designed to convert children to a particular religious faith pose the same risk [of divisiveness in the school].  And, just as a school may allow meetings to

discuss current events from a political perspective without also allowing organized political recruitment, **so too can a school allow discussion of topics such as moral development from a religious (or nonreligious) perspective without thereby opening its forum to religious proselytizing or worship**.

*Milford*, 533 U.S. at 131-132 (Stevens, J., concurring) (emphasis added); *see also id.* at 132 (quoting *Campbell v. St. Tammany Parish Sch. Bd.*, 231 F.3d 937, 942 (5th Cir. 2000) ("Under the Supreme Court's jurisprudence, a government entity such as a school board has the opportunity to open its facilities to activity protected by the First Amendment, without inviting political or religious activities presented in a form that would disserve its efforts to maintain neutrality.")).

CEF argues that being denied access to after-school activities buses, District sponsored snacks, and listing on a "class activities" schedule has infringed its free speech rights under the First Amendment and has caused enrollment in the GNC at Jenny Lind to decrease dramatically.  CEF claims that being denied membership in the After-School Program is unconstitutional viewpoint discrimination, and is not reasonable in light of the purpose served by the forum.

The Court disagrees, and finds it unlikely that CEF will prevail on the merits of this claim.  Religious instruction, by its very nature, often deals with character development and moral lessons.  This realization requires the Court to adopt a fine-grained approach to addressing the issue of GNCs in schools.  The Court has carefully considered the relevant case law and finds that while **part** of what GNCs do is in fact analogous to the activities of the Boy Scouts and other secular groups and thus must be

permitted in the same forums, other GNC activities are not confined to development of morals or character.

Though CEF may have been found in other cases to confine its activities to "influencing character development and spiritual growth," the evidence in this case suggests identifiable differences, notably proselytization and prayer, between CEF's activities and goals and those of other organizations, particularly the Boy Scouts. Instead, the Court finds that at least some of CEF's activities are not religious interpretations of secular topics, but are instead directed towards teaching religion itself. Thus, the District's restrictions would likely be found reasonable in light of a legitimate government interest, and would not constitute viewpoint restriction.  Because CEF is unlikely to prevail on its claims of violations of its First Amendment Rights, this factor weighs against granting a preliminary injunction.

### B.    Establishment Clause

The District argues that its constitutional interests in not violating the Establishment Clause outweigh CEF's free speech interests in being allowed to use the District's busing and snacks.  An abridgment of free speech otherwise protected by the First Amendment must be justified by a compelling governmental interest.  *Lamb's Chapel,* 508 U.S. at 394.  A state interest in avoiding an Establishment Clause violation can be characterized as "compelling."  *Widmar*, 454 U.S. at 271.  "[T]here are heightened concerns with protecting freedom of conscience from subtle coercive pressure in the

elementary and secondary public schools." *Lee v. Weisman*, 505 U.S. 577, 592 (1992).

In discussing the Establishment Clause, the Supreme Court has stated:

> In the course of adjudicating specific cases, this Court has come to understand the Establishment Clause to mean that government may not promote or affiliate itself with any religious doctrine or organization, may not discriminate among persons on the basis of their religious beliefs and practices, may not delegate a governmental power to a religious institution, and may not involve itself too deeply in such an institution's affairs.

*Cnty. of Alleghany, et al. v. Am. Civil Liberties Union Greater Pittsburgh Chapter, et al.*, 492 U.S. 573, 590-91 (1989).

In order to determine whether a challenged practice "constitutes an endorsement or disapproval of religion[,]" the practice must be "judged in its **unique circumstances**." *Id.* at 624-25, (O'Connor, J., concurring) (quoting *Lynch v. Donnelly*, 465 U.S. 668, 694 (1984) (O'Connor, J., concurring)). In addition, the challenged practice must be considered from the perspective of a hypothetical reasonable observer who is "aware of the history and context of the community and forum . . . ." *Capitol Square Review & Advisory Bd. v. Pinette*, 515 U.S. 753, 780 (1995) (O'Connor, J., concurring ).

The familiar test from *Lemon v. Kurtzman*, 403 U.S. 602, 612-13 (1971), is the standard by which potential violations of the Establishment Clause are evaluated. *ACLU Neb. Found. v. City of Plattsmouth, Neb.*, 419 F.3d 772, 775 (8th Cir. 2005). Under *Lemon*, there is no Establishment Clause violation if the challenged law or practice (1) has "a secular legislative purpose," (2) "its principal or primary effect . . . neither advances nor inhibits religion," and (3) it does not "foster an excessive government entanglement with religion." *Lemon*, 403 U.S. at 612-13. In *Agostini v. Felton*, 521 U.S.

203, 233 (1997), the Court clarified the third prong of this test, concluding that it is best understood "as an aspect of the inquiry into a statute's effect."

An entanglement must be excessive before it runs afoul of the Establishment Clause, and this requires more than mere "[i]nteraction between church and state," for some level of interaction has always been "tolerated." *Id.* As the Supreme Court explained in *Agostini*, the factors employed "to assess whether an entanglement is 'excessive' are similar to the factors . . . use[d] to examine 'effect.'" *Id.* at 232. Thus, the Court must look to "the character and purposes of the institutions that are benefited, the nature of the aid that the State provides, and the resulting relationship between the government and religious authority." *Id.* (quoting *Lemon*, 403 U.S. at 615).

The Court must first determine if participation in the After-School Program could be considered school-sponsored (or "government") speech, thus triggering Establishment Clause scrutiny. The Court then evaluates whether permitting CEF to be a part of the After-School Program is permissible within *Lemon*.

### 1.   District Sponsorship of After-School Program

CEF contends that the organizations participating in the After-School Program are not government speakers, and that their speech is private. "[T]here is a crucial difference between **government** speech endorsing religion, which the Establishment Clause forbids, and **private** speech endorsing religion, which the Free Speech and Free Exercise Clauses protect." *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 302 (2000) (quoting *Bd. of Ed. of Westside Cmty. Sch. (Dist. 66) v. Mergens*, 496 U.S. 226, 250 (1990)). "School

sponsorship of a religious message is impermissible because it sends the ancillary message to members of the audience who are nonadherents 'that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members of the political community.'" *Id*. at 309-10.

The Court must consider a number of factors when determining whether religious speech is school-sponsored and thus prohibited by the Establishment Clause, or private speech protected by the Free Speech and Free Exercise Clauses.   First, the Court must consider the degree of school involvement with the speech and the extent to which the speech bears the imprint of the state.  *Doe v. Sch. Dist. of the City of Norfolk*, 340 F.3d 605, 611 (8th Cir. 2003).  Courts also consider the extent to which the school is involved in deciding whether there will be a message, who will speak, or what the speaker will say.  *Id.* at 612.  Finally, courts consider whether an objective observer would perceive the speech as state endorsed.  *Id.*

District staff create and distribute the "class choices" forms to students and their parents.   The forms clearly identify the District (via the school, or a school representative) as the sponsor of the programs listed on the forms.  (*See* McDonald Aff. Exs. A ("Make checks payable to Jenny Lind C.Ed."), D (including a logo for the Minneapolis Public Schools).)   Further, the class activities form includes the phone number and contact information of a District employee, and the form contains the logo of the Minneapolis School District.    The After-School Program bears the imprint of the state.

Site Coordinators select what programs are included in the After-School Program, and orient the individuals and organizations that participate. District staff are involved in disciplinary issues prior to, during, or directly following class meetings. The District claims that it prepares all of the paperwork regarding enrollment for the students and keeps attendance records for the meetings. The District also claims that it funds and provides after-school activities buses, school supplies, and treats for the students in the After-School Program. These facts, in addition to the fact that District Staff are involved in disciplinary proceedings, could suggest to an objective observer that the After-School Program is school sponsored.

CEF challenges the District's characterization of its involvement with the After-School Program. First, it argues that the District's Policy 1301 states that only organizations that are **not** school or District sponsored may apply to be CPs, and as CEF is a CP, it could not possibly be school-sponsored. Next, CEF argues that there is little editorial control over the content of speech of participants in the After-School Programs. CEF notes that despite its participating in the After-School Program for five years, the District exercised no content restriction or editorial control over the content of the GNCs. CEF argues that an objective observer would not understand the identity of the speaker to be the District, as: (1) no District employee has ever been a speaker at a GNC meeting; (2) GNC meetings are always directed by CEF members; and (3) CEF signed an indemnification agreement as part of the CPO process, and is required to include a disclaimer on its flyers that the Minneapolis Public Schools are legally unable to sponsor

the activities on its flyer.    Finally, CEF argues that the government does not bear ultimate responsibility for the content of the speech at GNC meetings.

Although it is a close question, on balance the Court finds it likely that the organizations participating in the After-School Program engage in school-sponsored public speech.   Such organizations are selected by the District for additional benefits separate from those of the larger group of CPs, the forms, flyers, and other information communicated to parents bear the logos and information of District employees, and the Site Coordinators exercise some control over the content of the After-School Program. Further, an objective observer, including the parents of After-School Program attendees, could reasonably believe that a religious program held on school grounds, for which they gave permission on a sheet including other school-sponsored activities, and which involves travel on a school bus, has the imprimatur and support of the school itself. Though the Court is not required to determine whether the After-School Program is school-sponsored speech at this stage of litigation, the Court concludes that the After-School Program will likely be found to be school-sponsored speech triggering the protections of the Establishment Clause.   This factor weighs against CEF's motion for a preliminary injunction as it provides a defense for the District against CEF's claims.

### 2.    *Lemon* Factors

The Court next must evaluate whether under *Lemon* the District's inclusion of CEF in the After-School Program (1) has "a secular legislative purpose," (2) "its principal or primary effect . . . neither advances nor inhibits religion," and (3) it does not

"foster an excessive government entanglement with religion." *Lemon*, 403 U.S. at 612-13.

The District first argues that GNCs do not have a secular purpose. One of CEF's primary goals, as articulated in its flyers and other materials, is to "evangelize" children and teach them that Jesus Christ is their savior. Thus, CEF's inclusion in the After-School Program could not be understood to have a secular purpose. Next, the District argues that the primary effect of CEF's involvement with the After-School Program would be to advance religion, again, noting the proselytizing nature of GNC meetings, and CEF's stated goals. Finally, though a high bar, the District argues that because of the various benefits, and the imprimatur of the District, associated with the After-School Program, inclusion of the GNC in such a program would foster an excessive government entanglement as prohibited by the Establishment Clause.

CEF does not specifically address the *Lemon* factors. Instead, CEF bases its argument that the District's Establishment Clause defense is meritless on *Prince v. Jacoby*, 303 F.3d 1074 (9th Cir. 2002). In *Prince*, the Ninth Circuit found that a school could not prevent a student Bible club from using school facilities, supplies, and buses, simply because the club addressed topics from a religious perspective. *Id.* at 1092 ("Providing meeting space during student/staff time, school supplies and bus transportation is not a direct payment to the World Changer's coffers, even though it may facilitate the World Changer's own religious speech."). The court further concluded that "[t]here is no risk of **government** indoctrination of students if student/staff time, school supplies and transportation are provided to all student groups, no matter how vociferously

the World Changers make their point." *Id.* at 1093. However, the factors the Ninth Circuit relied on included that the money supporting the benefits came entirely from student fees, and there was **no indication the club intended to conduct religious services**. *Id.* at 1093-94 (emphasis added). Additionally, the school in *Prince* provided supplies and buses to **all** groups, there was not a subset of groups that were provided specifically sponsored benefits as is the case here. *Id.* at 1093 ("In light of the numerous and diverse student clubs on the school's campus, the School District cannot easily grant special favors that might lead to a religious establishment.").

The Court is not here required to determine whether inclusion of CEF in the After-School Program is itself a violation of the Establishment Clause. It is sufficient that taking all of the present evidence into account, it is likely that the District could demonstrate that CEF's participation in the After-School Program violates the Establishment Clause.

## III.   IRREPARABLE HARM

To succeed in an action for a preliminary injunction, a movant must first show irreparable harm that is **not** compensable with money damages if it prevails on the merits. *Travel Tags, Inc. v. UV Color, Inc.*, 690 F. Supp. 2d 785, 798 (D. Minn. 2010); *see also Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009).

CEF argues that it has, and will continue to, suffer irreparable harm from the District's refusal to permit CEF access to the "class choices" list, and to buses and treats provided to other groups which are part of the After-School Program. However, CEF

admits that it is still permitted to offer its GNCs, using the District's facilities, albeit under "unequal constraints imposed by the District."   CEF's primary evidence of the harm it has suffered is the drop in attendance at GNC meetings.

CEF has pointed to no authority suggesting that a decrease in an organization's membership or attendance at meetings constitutes irreparable harm, and the Court does not now so find.   CEF also argues that it has been forced to print its own flyers and pay for its own snacks.  This argument fails to demonstrate irreparable harm for two reasons: (1) the GNC was already printing its own flyers, and providing its own snacks, prior to the advent of the CPO process; and (2) such harm is specifically compensable through money damages.

Further, CEF has, and continues, to participate in the CPO process, meaning that it can hold meetings on school grounds, and use the District's flyer distribution process. CEF presently takes advantage of these opportunities.  Thus, the Court finds that CEF has not shown a threat of irreparable harm.

## IV.   BALANCE OF HARMS AND PUBLIC INTEREST

CEF argues that the balance of the harms weighs in favor of granting injunctive relief.  According to CEF, the harm it faces is a restraint on speech and diminishment of membership, and the harm to the District is, if anything, confined to administrative costs. CEF argues that it only wants to maintain the "status quo" of its involvement with the After-School Program with full access to the benefits provided to those programs.

On balance, if CEF's claims were stronger, the balance of harms would likely tip in its favor, as would the public interest.   However, the Court concludes that CEF is unlikely to succeed on the merits of its claims and that granting the preliminary injunction in favor of CEF might cause the District to violate the Establishment Clause. Therefore, the Court finds consideration of the *Dataphase* factors do not support a grant of a preliminary injunction.

CEF has participated in the Minneapolis School District's After-School Program since approximately 2000 and in the District's CP program since the program's inception. This participation has allowed CEF the use of the District's facilities for after school programming for children.   What is different about this case from other similar cases that have preceded it, such as *Milford*, is that in this case the record makes clear, as plaintiff readily admits, that CEF's programming includes prayer and evangelizing.   Programming is not limited to teaching moral leadership from a religious point of view.   In the Court's view, based on the record before it, the District has not acted in an unconstitutional manner in denying to CEF the additional benefits of school sponsorship – inclusion in the school activities flyer, and snacks and busing.   CEF continues to have access to school facilities as a CP.   The Court thus denies CEF's motion for a preliminary injunction in which it seeks the additional benefits of school sponsorship for its programming.

**ORDER**

Based on the foregoing and the records, files, and proceedings herein, **IT IS HEREBY ORDERED** that plaintiff's Motion for a Preliminary Injunction [Docket No. 9] is **DENIED.**

DATED:  September 30, 2011
at Minneapolis, Minnesota.

s/ *John R. Tunheim*
_____
JOHN R. TUNHEIM
United States District Judge